Your Honors, if it please the Court, John Neeleman, here representing Design Resources, Inc. As the Court is aware, this is a Lanham Act claim and also a claim under the North Carolina Unfair and Deceptive Trade Practices Act, alleging false advertising by the defendants, Ashley Furniture Company and the trade association, Leather Industries of America. I will at times refer to my client as DRI and Leather Industries as LIA. DRI sought advice from LIA. DRI is a producer and seller of furniture covering, and it sought advice from LIA as to what to call its new product. And LIA advised that it should call it bonded leather and also tested this product in order to determine the composition of the product so that DRI could properly label it according to the FTC guides found at 16 CFR 24. Later at the high- Bonded leather is authorized by regulation? Well, yes, it is. If you put the you can name any leather look product, you can call it bonded leather, as long as you identify the constituents of the product on the label. The Leather Industries of America tried to change that regulation, and the FTC denied that request. And so one thing that is absolutely clear in this case is that DRI was at all times entirely within the law. The regulations were somewhat agnostic to it. I mean, what is a component? This is leather shavings, 17 percent on the bottom side of this product. And you think the regulation said they can call that bonded leather? Well, it said you can call it bonded leather if you disclose the constituents, and that's exactly what Dr. Nicholas Corey of Leather Industries of America said was the prerequisite, which is why they sent the product to the Leather Research Laboratory, which is owned by LIA, to be tested so they could put that on the labeling. That's the only requirement. And, in fact, that was confirmed when the- If somebody said I purchased bonded leather, what they purchased? Well, Your Honor, it's on the label. So presumably the public would have read the label, but here the customers of DRI and the relevant customers were the retailers who would then sell it to the public. Okay? The district court granted summary judgment against DRI on two bases. First, the district court ruled as a matter of law that there was no evidence the consumers understood that the offending Ashley ads were about bonded leather. And in doing so, the district court simply made a mistake. Sometimes we come here after summary judgment and we argue that the district court acted as the fact finder. Here the district court simply made a mistake. It overlooked the survey conducted by Ashley itself that found that consumers, rather, the readers of the ad, not consumers, understood it to be about bonded leather. Secondly, and that Klein report is at pages 413 to 461 of the joint appendix. Secondly, the court ruled-I mean, secondly, the court overlooked an interview contemporaneously given when the ads were run by Tom Leon, an executive at Ashley, in which he expressly linked the advertisements at issue here with bonded leather. So there should be no issue at all about whether these advertisements referred to bonded leather, even though Ashley engaged in the typical type of- No, the Ashley ads don't say the words bonded leather or next leather or anything like that anywhere, and even though your expert couldn't identify the picture in the ads as your product. Well, my expert that couldn't identify it was an economist that was strictly called to talk about finance, Your Honor. But this is specific-this is exactly why the law is the way it is, because false advertisers often engage in these kinds of evasions. But there was another part to that question, I think. The question also- Yes, it doesn't indicate anywhere in the ad the words bonded leather, next leather, anything like that. Well, that moves me to the second basis on which the district court granted summary judgment, and that was that the court found as a matter of law that there were other participants in the market who were selling bonded leather. Again, the district court was simply mistaken. So when it said bonded leather, it had- Yeah, it doesn't say bonded leather. I mean, but when they understood it to be bonded leather- Doesn't it have to be unambiguous? Well, it is unambiguous, Your Honor. It doesn't- No, you're piecing together, for lack of a better word, scraps from here and there. To put it together and say this ad is about bonded leather when it's not clear. But, Your Honor, the law most emphatically is not that it has to say who the target is. In the Castrol case, Castrol v. Pennzoil, Castrol was not mentioned in Pennzoil's advertisements. There was still literal falsity. The court understands that- Is there a difference between shaved leather and scraps leather? There isn't, because Tom Leon talked about- Well, there is, I guess, in common usage, but not as the parties described this product. When DRI sent the- That's another inference you'd have to do because doesn't the ad use the word scraps leather and your description of the bonded leather uses shavings? Well, when DRI sent the sample to Leather Industries of America for testing, they called it scraps. And when Tom Leon was interviewed, he said shavings or scraps. So parties are using the terms very loosely here. They know what they're talking about. What is the first-the first-can we at least agree that the first element of a Lanham Act claim is that there has to be a false or misleading description of fact about the product? Yes. Where is that? Okay. And I'm looking now at the Ashley ad, if you want to start. Right. Okay. So the Ashley ads warn potential purchasers of bonded leather to beware of upholstery suppliers who are, and here I'm quoting, are using leather scraps that are misrepresented as leather. There is no-there's no-there's no- It doesn't apply to your client, does it? It doesn't. My client was not misrepresenting his product as leather. It was false. They're not. So they're expressing-they're warning the public that beware of people who are misrepresenting people using scraps of leather as leather. Well, Your Honor, the Klein report established that the public knew it was bonded leather, and my client was the only client selling-well, the only company selling bonded leather, so they understood that it was talking about my client and it was a false statement about my client. You're saying this is-with all due respect, Your Honor, circular reasoning. You're saying that it was-it said a false statement about my client, therefore it wasn't about my client. There's no statement. There's no statement and there's no reference. There's not even a reference to bonded leather. Well, again, Your Honor, there was no reference to Castrol in the Castrol v. Pennzoil case, but their own- Going back to Judge Duncan's initial question is where is the actual statement of falsity? Could you- The false statement is- About your client. The false statement is that my client is misrepresenting his product as leather. He's calling it bonded leather. It's not the same thing as leather. I thought the ad's saying beware of persons who are advertising it as leather. Right. But the ad is talking about bonded leather. That's what the survey establishes. Beware of people who advertise false leather as leather. Well, nobody's doing that, Your Honor. Nobody's doing that. It doesn't matter. It's referring to bonded leather. You're saying this is false. It says know what you are buying. Don't let yourself be fooled. Don't unknowingly fool your customer. Your reputation depends on it. Nobody's fooling anybody. The constituents are right on the label. All they're saying is beware of people who are misleading. If you're not misleading, I think yours is the reasoning that's circular. And we haven't come to a starting point yet. We haven't identified anything in any of these so-called offensive advertisements that is even misleading, let alone false. Well, Your Honor, the advertisements are saying that bonded leather sellers, and with all due respect, it's undisputed the advertisement's talking about bonded leather. That's not a contested issue in this case. The condition of the warning in the ad is anybody who advertises this material as leather, beware. True. You are not anywhere advertising, at least according to you, advertising your product as leather. Nobody is. What doesn't matter with nobody is you're the one that's a plaintiff, and you're saying you're the target. But you're not advertising it as leather. Doesn't that end it? No, it doesn't, because you have to look at the entire context under the case law, under Scott, et cetera, under Castro. And the context says that what this was addressing is undisputedly bonded leather. And what they're saying is that to call it bonded leather is to call it leather, and that's a lie. And that's the false statement. That's a real reach. They're saying people who the best you could come out with your inferences is that beware of people who are advertising bonded leather as leather. Right. Well, no. And you don't do that. No, what they're saying is beware of people who are advertising as bonded leather because it isn't leather and they're lying. That's what they're saying. They just use the word leather in there. They don't say anything else. Well, I know, Your Honor, but the case law recognizes that companies. Case law, I'm talking about just factually. Quite apart from the fact that this is not even a misrepresentation because they're not representing anything. What they are doing is admonishing. They're warning people, be careful about phony leather. Now, is there any problem with that? No. What they're saying, Your Honor, if you put it in the context with the Tom Leon interview and with what the respondents to the client survey said, these advertisements are talking about bonded leather and what they're doing is condemning the use of the bonded leather. Even though they're saying leather, that's code for bonded leather. Okay. And the reason the case law is what it is, is that parties engage in this kind of code speak in a very insular, hothouse of economic activity such as existed at the high point market. They know what they're talking about, Your Honor. Lawyers vetted this, and the desire is precisely to escape detection such as you're describing. But the case law allows. What if they said this? Beware of DRI's representation of bonded leather as leather. Would that be a misrepresentation? Yes. What's the misrepresentation? Well, because they're insinuating that DRI in representing it as bonded leather is representing it to be leather. Well, somebody could draw that conclusion, and they're saying, beware, bonded leather is not leather. Now, what's wrong with that? That's truism. That's true. But what they're saying, Your Honor, is that DRI is advertising its product as leather when it's advertising it as bonded leather. And related to that, they're suggesting. Beware, in other words, don't miss. How about if they said this? Let's make it clearer to get to my point. Beware or do not misconstrue the term bonded leather to be real leather. Could they say that? Yes, they could say that. To be genuine leather when you say real leather. But, Your Honor, they're also suggesting that something illegal is being done. There's an inset in the advertisement that shows a cease and desist letter from years before that has nothing to do with this. You have to put a magnifying glass up to it to see that. And they're also suggesting that there's liability and that you can be liable, but the overseas manufacturer cannot. Now, if I could. But presumably you could be liable if you misrepresent it, which is the action that it's referring to. But nobody's doing. That's not happening. What they're referring to is what DRI was doing. They're suggesting what DRI was doing is illegal because they're calling it bonded leather. This term bonded leather had never been used in the furniture industry. It sounds a little bit like a persecution complex. They're not saying that. You're saying, but they're aimed at me. And we're saying, well, why are they aimed at you? Because when they refer to the product, they're referring to bonded leather and saying, beware, bonded leather is not leather. Now, that's a truism, if that's true. Bonded leather is not leather. You just conceded that. So they say, beware, do not misconstrue bonded leather to be leather. But that's not what they said. What's the ad say? Well, the ad says that you might be legally liable if you market this product as bonded leather. What does? It says that the overseas manufacturer can't be liable, but you can. And then it has. You misrepresent as leather. Right. But, Your Honor, the context, again, establishes that DRI is establishing, is misrepresenting leather as bonded leather. Now, if I could just talk. I realize I'm over my time, so I guess I'll reserve it. You've got some time coming, don't you? Yeah, I've got seven minutes. Okay, good. So I'll let them go, and then I'll, or do you want me to just continue? Well, if you want to take it off your rebuttal time. I'll just say quickly about LIA. Dr. Corey said that it was outright fraud to call it leather. The district court found that looking at it in isolation, that was a true statement. But he said it in an article about bonded leather. He was talking about bonded leather. There's no doubt about that. Okay? Okay, but that comes back to the very same thing you agreed with me, is that no one could legitimately call bonded leather leather. Right, but that wasn't the issue at hand. The issue at hand was whether you could say bonded leather, and that's what they were saying. They were saying, okay? Thank you, Your Honor. Mr. Copenhaver. I'll reserve it. If it pleases the court, Andy Copenhaver. I represent Ashley Furniture Company. I thank your court. The court has addressed some good questions to opposing counsel. I'll try and skim through part of the law on Lanham Act very quickly and get to the few points that I think really are important. But it is a Lanham Act claim. This court, back in Scotts in 2002, spent a lot of time letting the world, at least in this jurisdiction, know exactly what a Lanham Act claim is and how you go about establishing it. Judge Osteen, in his opinion, cited extensively from Scotts. And so Scotts basically says the first thing you've got to do in analyzing potential liability under the Lanham Act is to look at the unambiguous claims in the alleged offending ad. And this is the ad. It was a series of ads that there were about six of them, all caveat emptor. Ron Wainick, the chairman of the board of Ashley, basically testified that he was seeing a lot of problems in imported goods. This ad doesn't talk about it, but his testimony was from China and that he wanted to make all the American companies aware of these problems. So there were a series of these, I think six. They addressed mattresses, foam, fire retardant issues, and they all were in similar fashion. This particular ad ran three times. It ran once. On March 12th. Right, just two weeks before the spring high point market. Correct. And then again on March 31. Was that not coincidental? No. I mean, clearly, I mean, Mr. Wainick was trying to alert people as they go into the buying season to here are issues you need to watch out when you're buying product from offshore. The second one ran, the high point furniture market was in the last week of March 2007. The second ad ran on 3-31, the very last day of the market. They ran one follow-up ad, this one. There was this whole series being run. But this particular ad, is it really leather, ran again at the, I think, April 30th. So that's the ad, and that's what the plaintiff's contentions are based upon. And it says, is it really leather? And then it describes a product that's not under the FTC definition. It's the only time you can label a product leather is if it's the hide of an animal. Anything else can't be labeled leather. Judge Osteen cites the reg in his opinion. This clearly isn't just leather. It's got a lot of other products in it. And then after showing all of that, the statements made, some upholstered suppliers are using leather scraps that are misrepresented as leather. And it goes on to talk about the product, know what you're buying. That's this ad. Now, this is a CPSC letter that's attached. It ran in all of these ads. And the basic point of this one, this doesn't quote the FTC, but basically it's the CPSC advising that if you're selling product in the United States that's been imported, you can't rely upon any assertions, representations, certifications made by the foreign manufacturer or supplier of the product. You've got to verify it and you've got to comply with U.S. law. And you're responsible for that, you being the U.S. company. So that's the offending ad. Now, first step, what are the unambiguous claims in here? We submit that it's all unambiguous and it's all true, that this ad is not literally false. I mean, it describes the product, the testimony, the uncontroverted testimony from Ashley's vice president of leather goods, is that he had been a few months before these ads ran on a trip, that over two years he'd seen products similar to this in China, and that a few months before on his last trip he'd seen this particular product, which isn't the plaintiff's product or DRI's product, because this is, if you look at it, it's got a sheet of leather. Well, that sheet of leather is just the strips of leather that the testimony from several sources is they took the strips of leather, glued them all together, and made sheets out of it. I mean, a high didn't square, so you cut off a lot. They take the scraps, they glue it back together, make a sheet of leather, and they bond it to the back of denim. And then on the other side they attach the polyvinyl chloride or polyurethane that looks like leather. The plaintiff's product, and the testimony is clear, is his product, which is both of these are generic bonded leather. The term's been used by the FTC going back, well, these guidelines had been issued for 10 years because Dr. Corey's testimony was that in 2007 they came up for their 10-year review and the FTC always puts them back out for public comment to see if they need to be tweaked. So the FTC had used this for 10 years anyway, talking about bonded leather. This product is a bonded leather product that's shown in the ad. Plaintiff's is. But plaintiff, instead of taking the scraps, testimony is they would grind up the little bits and pieces, grind them up on the back of the denim on the other side, which is the polyvinyl chloride or polyurethane, and they'd put on glue and they'd spray the particles on it. So there's no separate sheet attached to the back. Do you disagree then with your colleague? I asked him the question whether there was a difference between scraps and shavings, and I gather your argument now suggests that there's a difference, that the scraps are shown in there are actually strips glued together, whereas the shavings are ground up and glued on. That's our position, Your Honor. Yes, sir. It's a difference in the number of layers, isn't it? Because apparently, as I understood it, it was different to have that independent layer that is represented in the picture. Yes, Judge Duncan. And having the application of the combined stuff. Both of them fall within the generic definition, bonded leather. But the product that's being shown here is a tri-cast, and you've got a layer. You've got the middle layer of denim. You've got the PVC or polyurethane on the third, and it's a tri-cast. In this one, you've got the first two layers, but then all you've got is a spray on the back. So there is a difference. Now, we'll argue whether or not that's relevant or not, but the product's different. The message I gather is beware of these products, this type of product, bonded product. Beware that this is not leather as leather is appropriately understood. And that's a truism, and I think your colleague agreed to that. Watch out for foreign manufacturers or for suppliers, which is a broad category from the foreign manufacturer of furniture, and our man said that he actually testified. Most of this bonded leather come in from China? Yes, sir. And our vice president of leather testified that he had been over there these few months before and actually gone to a Chinese furniture manufacturer and had seen this precise product that we're talking about on upholstered goods labeled as leather upholstery. But what you're saying, as I understand it, is it couldn't be a reference to DRI in any event because this picture is of a product that is a TriCast. Not for literal falsity. I think that's it. There's nothing here. Now, on literal falsity, we say the ad's true. The judge agrees with us. And then he went into literal falsity by implication. Now, by implication, and it's what that is, and this case is recited, but it's although by necessary implications. Okay, there's something missing out of this ad that doesn't make it false but that everybody that reads it by necessity knows what this extra thing is and plugs it into the ad so they take away that this is a false statement. And I know Judge Osteen called it an embedded false message. Well, for that, it's got to be necessary, necessarily, false representation by necessary implication. I mean, it's a strong tie there. The good case, I mean, in the case of Scott's, you had crabgrass prevention products don't kill mature crabgrass. That's acknowledged. Scott's had that all over, that it killed it pre-germination. But it showed a mature one. And so right beside the mature one was the disclaimer saying, this will kill up to four weeks after germination. So that's what it said. But then Scott's claiming, well, wait a second, our competitors picture mature. That's the necessary implication you need, and so that makes it wrong because the buyer is going to look at the mature crabgrass on the package and say, hey, this will kill my mature crabgrass. And the court said, no, that's a leap. That may be the case. Maybe you can go to implied falsity, but you can't get it under the more rigid standard on the top end because under literal falsity, damages are presumed. You make that establishment. But your argument, I gather, is any bonded leather, whether it's this one, which I guess Judge Duncan referred to as TriCast. That was our discussion. Either that or DRI's product or any other product of an in-between, any of them that are called bonded leather still ought not to be represented as leather. Yes, sir. And you can read the FTC regulation. That is specific. They are not the entire hide of an animal, which is what you have to have to be able to call it leather. But then on falsity by necessary implication, there can't be any ambiguity in these things. If there's ambiguity, then it's not literally false or literally false by implication. So if you look at this thing, we say everything we say is true. But looking at it from the plaintiff's viewpoint, you go through it. Okay, is this product shown his product? We say it's not. It's not in the pictures. It's not his product. But at the very minimum, are people going to think that is his product? That's ambiguous. We say it's clear. That red light's not ambiguous. Oh, I apologize, Your Honor. No, I think we understand your point. Why don't we hear from Mr. Malone? Good morning. May it please the Court, Richard Malone on behalf of LIA. We're asking that the district court's judgment be affirmed in its entirety. The case as to LIA comes down to two quotes that were given by a scientist, Dr. Nicholas Corey, and they ran in two separate articles in Furniture Today. And the district court correctly found that neither of those two quotes had a false statement of fact. The first one was true, and the second one was an opinion, and I'd like to speak for a moment about each of those. The first is the one that was briefly alluded to during counsel's argument, where in an article written by a woman named Joan Gunan, Dr. Corey was quoted as saying, calling it leather is outright deception, outright fraud. Now, the plaintiff concedes that that's a true statement, as it was said expressly, and the plaintiff also concedes that he has no evidence that anybody was deceived by that, so we can't have implied falsity. So the only way the claim could survive would be in that narrow zone of literal falsity by necessary implication, and that has to be unambiguous. And the district court correctly found that you cannot have an unambiguous statement when you are speaking in code, and that's the word that counsel used earlier to describe that the word leather was being used as code for bonded leather. And if you look at the article in its context, the word leather was used, and by the way, I'm looking at page 787 in the appendix. The word leather was used four times in the article by Dr. Corey, and each time the context is very clear that he was talking about leather. And then he used the word bonded leather two times, and it was clear that he was using bonded leather. So there's no way DRI can show that it's unambiguous that the one time they needed to make their case, he said one thing when he meant another. And particularly, the standard ought to be awfully high when Dr. Corey didn't even write this article. This was written by somebody else, Mrs. Goonan. So if the suggestion is that he was misquoted, that's another layer of why there's not an unambiguous statement by Dr. Corey. If there are no questions on that first statement, I'm going to move to the second, which ran a week later in an article written by Susan Andrews. And in that one, Dr. Corey was quoted as saying, calling it bonded leather is deceptive because it's a polyurethane product with leather sprinkled on the back. So unlike the Milkovich case, which was relied on heavily by DRI in their brief, the facts which show why he believed it was deceptive were put right out there for the readers to read and to determine to draw their own conclusion. In the Milkovich case, a high school wrestling coach gave testimony at two proceedings, a school board hearing and then a district court, and a reporter wrote in a story, I was there, I was at the incident where there was a brawl that happened at a wrestling match, and then I was in court and I heard his testimony and he lied. But the reporter never said what were the facts, what actually happened and what the wrestling coach testified. So the readers were left with the impression that this man was a liar and there were not any facts given to back it up. In our case, all of the facts on which Dr. Corey based the opinion that it's deceptive were right there in Ms. Andrews' article, and that's at page 790 of the joint appendix. And by the way, the Milkovich case even said that if somebody were to say that Jones is a scoundrel because he believes the teachings of Marx and Lenin, that would absolutely not be actionable because you're giving the reader the basis for the opinion, and therefore it's an opinion, not a statement of fact. In addition to affirming on those two grounds, there are several independent alternative grounds that the district court did not even find it necessary to reach, which would also support an affirmance. The first is that the article, the two articles, just like the Ashley adds, were not about DRI. They never mentioned DRI, and they never mentioned the product itself. And the plaintiff never gave any cites in support of its assertion that DRI was synonymous with bonded leather. On page 53 of their brief, they offer some cites, but those cites do not say that. And in fact, we offered three or four pieces of evidence, even though it's not our burden, which definitively prove that DRI was not synonymous with bonded leather. For example, one of the articles about bonded leather referred to a different product called Ocapel. And as was noted earlier, DRI's own expert said that in 2007, he knew all about bonded leather, but he had never heard of DRI until he was hired at the end of 2008. That's at pages 796 to 97 in 801, 802 of the record. And DRI tries to dismiss that by saying he's just an economist, he wasn't a furniture expert. This man had 42 years in the furniture industry. He's in the Furniture Hall of Fame. If you look at his resume, which is in the record, it's absolutely clear. If anybody would have known that these two were connected, he would have known. And in addition, there was an internal document written by DRI at exactly the same time as the quotes were given. It was July 13th, where DRI's internal product manager said, we have to come up with a name to distinguish our product from the generic category. So there's absolutely no way they can meet their burden to show this was about DRI. And finally, my last point briefly is that, even if they could meet those elements, they can't show any harm as a result of Dr. Corey's two statements. Council admitted that the market are retailers that would purchase products covered by this bonded leather product, and not one of those retailers testified in this case to say how they were influenced by the ad or whether it influenced their purchasing decision. And the timeline shows why that's true. DRI's own witnesses said that in March of 2007, at the High Point Furniture Market, everybody was talking about this new product and the controversy over the labeling. The two quotes did not come until July, four months later. So even if there were a link between the quote-unquote controversy and anybody's decision not to buy, there is absolutely no link to Dr. Corey's two quotes. And that's an additional reason why this should be affirmed. So just to conclude, I'd like to say this case has been around now for six years. At the motion-to-dismiss stage, the district judge wrote a 23-page opinion expressing skepticism of plaintiffs' claims and giving a roadmap for what would need to be proven to get by summary judgment. None of that was proven. The district court then wrote a 53-page opinion saying why there's no case here. And this court used the word persecution complex, which we did not use in our briefs but I think is an apt description, and therefore we ask that the judgment be affirmed. All right, thank you. Thank you. All right, Mr. Neilman. Your Honors, if you look at page 1648 of the joint appendix, Dr. Corey says in the quote, this is the article, Chemisphere's Confusion Over Imitation, it's Mayher category where he says outright misrepresentation, outright fraud. In the next to the last paragraph he says, it's difficult to get terminology changed, he said. Here at that part the reporter's paraphrasing. Then the quote, bonded leather is with us, it's here, but these companies are actually manufacturing synthetic laminate products. That was the issue. That's why he was angry. He was a leather man. He felt that this was a misuse of the term, but he called DRI a liar, which it wasn't. He recommended to DRI. He himself used the term bonded leather. Where does it say DRI? Well, it doesn't say DRI, Your Honor. You've got to be careful because that's the whole issue in the case. You can't just say to us he's calling DRI. Well, Your Honor, Judge Osteen concluded that it could, well, the evidence is, Your Honor, this feels like actually a closing argument in a trial with all due respect. The evidence is that DRI was first to market. That's what Mr. Nanus has testified to. That's what Mr. Silver testified to. Now, Judge Osteen said that, for example, Klausner and Katnapper were also selling at the spring 2007 market, so it couldn't have been first to market, but Judge Osteen overlooked evidence in the record that DRI had sold market sample orders in late 2006 to those companies. They were his customers. They were showing DRI's product, okay? So DRI was the only player in the market during the relevant time, and these articles, these advertisements were undisputedly about bonded leather. They didn't mention Dr. Klein's survey in responding to me. So there's no issue here that these were talking. These weren't talking about leather. They were talking about representing this product as bonded leather. There's no question about that. Now, Your Honor, Judge Neimeyer. I get back to my underlying question that I've asked you sort of repeatedly, and here Andrew quotes Corey as saying, Dr. Corey says calling these products bonded leather is deceptive because it does not represent its true nature. It's a vinyl or polyurethane laminate or a composite, but it's not leather. If you tar and feather someone, does that make them a chicken? So he has explained his position that the term bonded leather is a misleading term, and because it's really a composite, and he concludes right there saying, but it's not leather. Yes. And that's really the issue in this case that he's after. He said, let's not, and that's Ashley's ad, let's not be sucked into believing that bonded leather is leather. And if you misread it or misunderstand it, you're going to make a mistake. And I would assume that bonded leather uses the word leather. Don't misconstrue it. Beware that bonded leather is not leather. That was what the Ashley ad is, and that's what Corey is warning about. You read it yourself, Your Honor. He said to call it bonded leather is deceptive. What was offensive to him is that he felt bonded leather should be reserved for leather products. Okay? That's what he felt. That's what he felt. That's his opinion. Well, Judge Osteen concluded that that gave him immunity, first because he wasn't an expert, but if you look at page 7 of our brief and the pages 3, 10 to 15 of the joint appendix, LIA represented to the FTC that it has frequent and extensive involvement in helping its members apply the existing FTC guides to specific consumer products. So it was an expert, and it knew it wasn't deceptive because the FTC guides permit the use of the term and all of the constituents were shown on the label. Nobody is being deceptive here. Are you saying I believe it's deceptive? Well, it is. I don't think it has enough leather in it. It's really a composite. Well, the Supreme Court has said if you call someone a liar, even if you couch it as an opinion, it's defamatory if they're not lying. It wasn't deceptive. It was plain on the label. Now, I have some more references to the record here. There's no question, again, that they were talking about bonded leather. They were commercially motivated, and they knew that it was DRI. At pages 320. Are you talking about Ashley or are you talking about Corey? I'm talking about them both. In the e-mail exchange. Talk to the general. Well, Your Honor, if I can explain. I'm sorry to interrupt, but I'm running out of time. There was an e-mail exchange between Chris Ross of Ashley and Dr. Corey. So they were both involved communicating about this common problem, bonded leather. And Chris Ross wrote, DRI is doing a good job of merchandising this product to manufacturers. And that's in the e-mail string 320 to 333 of the joint appendix. That was their preoccupation. Okay? If you look at 332 of the joint appendix, Ross to Corey, I am hearing that it is starting to pay off. He's talking about Corey's interviews. The people are not buying bonded leather. If you look at the pages 1815 to 1817 of the joint appendix, in an e-mail exchange between Lisa Dare and Ron Wannick, the founder of Ashley, Lisa Dare is saying we have to develop this same product, this same product that DRI was selling, because we don't have any competing product. And they talk about price point. They talk about its qualities. They don't have a product to compete. That was their concern. So there's no question that this is about this is commercial in nature, and it's about DRI. Dr. Corey sent an internal e-mail saying he wanted to curry favor with Ashley and help him with this so that he could get more business. His constituents were the leather industry. With respect to Ocapel, the article did not say Ocapel was being marketed as bonded leather. They referred to it as a product that had been around for a long time that wasn't called bonded leather. And Mr. Nannis testified it wasn't the same thing as his product. It was actually cited as a contrasting example. So their use of Ocapel, Mr. Malone's use of Ocapel, with all due respect, as an example of a competing bonded leather product is just not accurate. And the statement that we have to find something other than the generic category bonded leather doesn't establish that DRI was not the sole actor in the market and first to market. Now, I have to talk about TriCast. If we're talking about whether the ad, Chris Ross, who said it was TriCast, didn't work on the ad. He was in China when the ad was issued. Ron Lonick didn't know what TriCast was. And we have the client survey that says that nobody believed it was TriCast. TriCast was never marketed in the United States. So they did this ad aiming at something they'd never seen in the United States. I think I'm out of town, Your Honor. Thank you. We'll come down to Greek Council and take a brief recess. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, Allyson K. Duncan, Stephanie D. Thacker